LEHAN, Judge.
An insurance company appeals from an order stacking uninsured motorist coverage for all vehicles on the insured’s car sales lot. We reverse.
The insured, Sandra G. Coleman, who owns a used car sales lot, purchased automobile insurance from a company which later became insolvent. Her claim is now directed against the appellant, Florida Insurance Guaranty Association, Inc. (FIGA).
The insurance policy purchased by Mrs. Coleman was a garage policy. The declarations page of the policy shows the various coverages purchased. For example, the policy indicates that collision insurance was purchased for "owned autos only.” In contrast, liability insurance and uninsured motorist coverage was purchased for “any auto.” The policy later shows the amount of premium for each type of coverage. For uninsured motorist coverage, Item Ten of the policy states “Number of Plates — 2” and “Rate Per Plate — 7.00” and a premium of $14.00.
Mrs. Coleman’s business had a varying number of used cars on the lot at any given time which could be operated by using up to fifty temporary paper license tags. Her business had two permanent dealer plates.
Mr. Coleman was injured in an automobile accident. The insurers of two other cars involved in the accident paid him the limits of their coverages for a combined total of $75,000. The Colemans then filed this claim against their insurer for uninsured motorist (UM) benefits.
The dispute between the Colemans and FIGA concerns how much UM coverage is available under the policy. The Colemans claim that because Mrs. Coleman, when purchasing the policy, did not make a knowing and informed rejection of higher limits, the available coverage is $100,-000/$300,000 and that this coverage is applicable to every car that was titled in Mrs. Coleman’s name on the day of the accident (a total of fifteen cars).
FIGA does not contest that there was no informed rejection by Mrs. Coleman but argues that the result is UM limits equal to the liability coverage purchased by Mrs. Coleman, i.e., $25,000, rather than the $20,-000 UM coverage shown by the policy to have been purchased by Mrs. Coleman. FIGA further argues that the number of UM coverages available to Mrs. Coleman is the number she purchased as shown by Item Ten of the policy, i.e., two coverages.
The trial court determined the limits of UM coverage to be $25,000. The court then determined that UM coverage should be stacked on the basis of the number of motor vehicles for which liability coverage was extended. The court’s order states that the policy clearly provided liability insurance for any car titled in the named insured and that, accordingly, the UM coverage should be extended to each of the fifteen cars owned by the named insured for a total of $875,000.
While we agree with the trial court’s determination that the limits of UM coverage are $25,000, as explained below we do not agree with the basis on which the court stacked UM coverage. Mrs. Coleman paid for two UM coverages. We conclude that the number of UM coverages available to be stacked should be based upon the number of cars for which UM premiums were paid. See Tucker v. Government Employees Insurance Co., 288 So.2d 238 (Fla.1973). See also Fireman’s Fund Insurance Co. v. Pohlman, 485 So.2d 418 (Fla.1986); Auto-Owners Insurance Co. v. Prough, 463 So.2d 1184 (Fla. 2d DCA 1985); Liberty Mutual Insurance Co. v. Furman, 341 So.2d 1056 (Fla. 3d DCA 1977). Accordingly, two UM coverages should have been stacked in this case.
The Colemans argue that because the limits of UM coverage are to be the same as the limits of liability insurance in *34 the absence of an informed rejection of higher coverage and because the policy provides that its liability insurance applies to “any auto,” the UM coverage applies to every car owned by them on the day of the accident. It is true that the Colemans would have had liability insurance covering them in any car being driven; the policy did not limit liability coverage just to the driving of any car which the Colemans owned. However, we conclude that the Colemans’ argument cannot be accepted because it would lead to an irrational result. See Wakulla County v. Davis, 395 So.2d 540, 543 (Fla.1981). To conclude that the UM coverage to be stacked is coextensive with the liability coverage would require stacking UM coverage for every car which the Colemans could conceivably drive whether owned by them or not. Recognizing that irrationality, the Colemans argue that the number of coverages should be limited to the number of cars owned by them. But, their argument is inconsistent. While arguing to increase the number of UM coverages by tying UM coverage to the number of cars which would be covered under the liability section of the policy, the Colemans recognize that they must limit the almost infinite number of cars which that argument would actually produce in order to bring the total number of cars within a sensible range. Therefore, they argue that UM coverage should apply only to the number of cars owned by the Colemans. However, as we have said, the number of cars owned has no relationship to the extent of liability coverage under the terms of the policy.
In any event, in the absence of an informed rejection, the statutes and case law merely tie the limits of UM coverage to the limits of liability insurance. See American Fire & Indemnity Co. v. Spaulding, 442 So.2d 206, 208 (Fla.1983); Decker v. Great American Insurance Co., 392 So.2d 965, 967 (Fla. 2d DCA 1981). The Cole-mans point to no authority, nor have we found any, that ties the number of UM coverages to the number of cars covered by liability insurance. To the contrary and as indicated above, the case law supports tying the number of UM coverages available to the number of premiums for which UM coverage was paid.
In arguing that the number of UM coverages should not be based upon the number of premiums paid for UM coverage, the Colemans argue that the law provides for UM coverage when an insurer fails to offer any UM coverage and that the insured in that type of situation obviously has paid no UM premium. But those were not the facts of this case, and we decline to address how many UM coverages would be stacked in that type of situation. We do note, however, that in that type of situation it may not seem irrational to conclude that one UM coverage would result because a court would then have no basis for ascertaining how many such coverages an insured might have purchased if the opportunity had been presented.
The purpose of the statutory scheme for UM coverage seems to be to provide for some such protection for every insured and not to give insureds UM coverage bonanzas which they have not paid for.
The Colemans further argue that the UM coverages should not be limited to two because the declarations page of the policy merely indicates a premium of $14.00 for UM coverage for “any auto” and does not show that two coverages were being purchased. However, as noted above, Item Ten of the policy indicates that the $14.00 premium was based upon two plates at a rate of $7.00 per plate.
On cross-appeal the Colemans contend that, in the absence of an informed rejection of higher UM limits, UM limits of $100,000/$300,000 should be implied because section 627.727(2)(a), Florida Statutes (1983), requires an insurer to inform an insured that those higher limits are available for purchase. We disagree. As we have said, in the absence of an informed rejection the UM coverage is increased to the limits of the liability coverage, in this case $25,000. See American Fire & Indemnity Co. v. Spaulding; Decker v. Great American Insurance Co.
*35 The Colemans’ other issue on cross-appeal concerns the manner in which the trial court set off the $75,000 already received by the Colemans from other insurance companies against the amount due from FIGA. However, we need not address that issue because pursuant to this opinion the total award from FIGA would be $50,000 minus the $75,000 set-off for a net award of zero.
The issue of the number of UM coverages available for stacking under the facts of this case appears to be one which has not previously been directly considered in Florida case law. This issue, which also does not appear to have been directly resolved by statute, is, in the final analysis and similar to various other uninsured motorist insurance issues, determined by a judicial perception of legislatively established public policy. The Florida Supreme Court is, of course, the ultimate judicial policy maker and perceiver. Accordingly, we certify to the supreme court the following question as one of great public importance:
WHEN AN INSURED HAS PURCHASED UNINSURED MOTORIST COVERAGE BUT HAS NOT MADE AN INFORMED REJECTION OF UNINSURED MOTORIST COVERAGE LIMITS HIGHER THAN THOSE PURCHASED, MAY THE INSURED STACK A NUMBER OF UNINSURED MOTORIST COVERAGES EQUAL TO THE NUMBER OF CARS OWNED BY THE INSURED OR MAY HE ONLY STACK THE NUMBER OF UNINSURED MOTORIST COVERAGES FOR WHICH HE PAID A PREMIUM?
RYDER, A.C.J., and SANDERLIN, J., concur.